IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ERDMAN COMPANY f/k/a MARSHALL §
ERDMAN & ASSOCIATES, INC., and §
MARSHALL ERDMAN DEVELOPMENT, §
LLC, § Civil Action No. 3:09-CV-1081-D
§
    Plaintiffs- §
    counterdefendants, §
§
VS. §
§
USMD OF ARLINGTON GP, LLC, §
et al., §
§
    Defendants- §
    counterplaintiffs. §

MEMORANDUM OPINION
AND ORDER

In this litigation arising from an unsuccessful collaboration in developing and constructing a medical office building, the court must decide on the parties' cross-motions for summary judgment whether plaintiffs can recover for breach of contract and promissory estoppel and whether counterplaintiffs can recover for breach of contract, promissory estoppel, and negligent misrepresentation. For the reasons set out below, the court holds that plaintiffs are entitled to proceed to trial on some aspects of their claims but not others, and it therefore grants summary judgment in part and denies it in part as to those claims. The court holds that counterplaintiffs cannot recover on any of their counterclaims, and it therefore grants summary judgment dismissing the counterclaims with prejudice.

This is an action by plaintiffs-counterdefendants Erdman Company f/k/a Marshall Erdman & Associates, Inc. and Marshall Erdman Development, LLC (collectively, "Erdman") against defendants-counterplaintiffs USMD of Arlington GP, L.L.C. ("USMD of Arlington GP") and USMD Hospital at Arlington, L.P. (collectively, "USMD") alleging claims for breach of contract and promissory estoppel. USMD asserts counterclaims for breach of contract, promissory estoppel, and negligent misrepresentation.

USMD operates USMD Hospital at Arlington, a physician-owned hospital, along with a medical office building on the hospital campus ("MOB I").[1] In 2005 USMD decided to sell MOB I and construct a second medical office building ("MOB II"). USMD solicited the assistance of Erdman, a developer who had helped

---

[1]Both sides have moved for summary judgment in this case. As the court has stated in cases such as *AMX Corp. v. Pilote Films*,

> [b]ecause both parties have filed motions for summary judgment, the court will principally recount only the evidence that is undisputed. If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence. In this way it will comply with the standard that governs resolution of summary judgment motions.

*AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5) (Fitzwater, J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)), *modified in part on other grounds*, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007) (Fitzwater, J.).

design and construct USMD's other projects.  The parties developed a working relationship based on an evolving combination of written agreements, oral representations, and assumptions based on earlier interactions.  After both projects were discontinued in 2008, a dispute arose over the parties' respective obligations and liabilities.  The instant claims and counterclaims arise from that dispute.

Erdman first became involved in the MOB II project in the fall of 2005, when USMD asked it to conduct a preliminary physician interest survey to assess the demand for a new medical office building.  Erdman had previously provided preliminary services to USMD on an "at-risk" basis——that is, without pay——in hopes of securing more lucrative design and construction services for the projects.  Whether Erdman would insist on some formal agreement determining duties and compensation depended on the level of trust in the relationship.  As Erdman's relationship with USMD progressed, Erdman became less concerned with documenting in a formal agreement every understanding between the parties.

By September 2006, after several concept studies and discussions between Erdman and USMD, the parties had made sufficient progress in the planning of MOB II for Erdman to propose two letters of intent to USMD documenting some terms of agreement. The first letter, dated September 14, 2006 ("September 14 Letter"), outlined terms such as Erdman's providing certain services at-risk

and USMD's agreeing to an exclusive relationship with Erdman as developer, and requested that USMD indicate acceptance with a signature. USMD did not sign the September 14 Letter. The second letter of intent, signed and dated September 25, 2006 ("September 25 Letter"), stated: "Your acceptance of this letter will constitute such authorization [to initiate development] and serve as the binding agreement between our two parties until a formal development agreement is executed." Ps. 10-6-10 App. 14. This agreement described an arrangement under which Erdman would own an interest in MOB II, handle design and construction services for MOB II, receive fees for certain services, agree to certain ground lease and tenant lease terms, and adhere to a budget. The letter represented that Erdman was "prepared to initiate this development immediately" upon receipt from USMD of written authorization to proceed. *Id.* at 14. Unlike the September 14 Letter, however, the September 25 Letter did not specify the parties' liabilities in the event the project was aborted or given to another development firm.

Meanwhile, sometime between September and November of 2006, USMD decided to involve Erdman in its plans for MOB I as well, and Greg Weiss ("Weiss"), who was at that time the President of USMD of Arlington GP, asked whether Erdman would be willing to purchase MOB I from USMD. Erdman submitted various proposals in a December 2006 meeting between Erdman and USMD representatives and a December 29, 2006 letter ("December Letter") from Erdman's Executive Vice

President and Chief Operating Officer Brian Happ ("Happ") to Weiss. USMD was dissatisfied with the prices offered, however, and it solicited offers from other development firms. As competing developers demanded development rights for MOB II in exchange for the purchase of MOB I, USMD informed Erdman that Erdman would probably lose the design and construction work for MOB II if a competitor purchased MOB I. According to Weiss, "there was never going to be an MOB II unless we had a sale for an agreed-upon price for MOB I. In my view, those were related projects." Ds. 10-6-10 App. 67.

This information concerned Erdman. It had already incurred costs providing preconstruction development work, even though a design-build contract between the parties had not been finalized. Erdman became concerned about who would be responsible for its out-of-pocket costs if the MOB II project were abandoned or awarded to a competing developer. Happ allegedly had several conversations with Weiss in the latter half of 2006 and into 2007 in which he reminded Weiss of the relationship of trust that had developed between Erdman and USMD and the costs that Erdman had already incurred as a result of the MOB II project. In December 2006 Weiss met in person with Erdman representatives Happ, Rustin Becker ("Becker"), and Jim Lawrimore where he allegedly offered to buy Erdman out or pay Erdman if USMD sold MOB I to a competitor and gave MOB II development rights to that competitor. On January 24,

2007 David Ransom ("Ransom"), the Director of Design and
Construction at USMD, allegedly acting on Weiss's behalf,[2] asked
Erdman for information about MOB II's status, tenant lease
percentages, and the project budget to assess what it would take to
buy Erdman out of the MOB II project. According to Happ, on
January 29, 2007 Weiss offered to make Erdman whole if the MOB II
project "went away" or if USMD chose to "go in a different
direction," Ds. 9-15-10 App. 28, 31-32, and he asked what USMD's
exposure would be. Weiss testified that he did not recall whether
he had such a conversation. Happ believed this was a promise for
full reimbursement because USMD had once reimbursed Erdman without
an agreement when a project in the Las Colinas area was abandoned.
Happ documented his account of this conversation in an internal
email. On February 20, 2007 Weiss sent a letter ("February
Letter") to another Erdman Executive Vice President, William L.
Peel, Jr., that communicated that USMD was unwilling to accept
Erdman's offers to acquire MOB I. But the letter also stated that,
in an effort to avoid delays to MOB II, "[Erdman is] hereby granted
exclusive right to development of a medical office building of
approximately 120,000 square feet [i.e., MOB II] as outlined in
[the September 25 Letter]." Ps. 9-15-10 App. 17; Ds. 9-15-10 App.
57.

---

[2]Weiss did not specifically recall requesting this information
from Ransom, although Weiss conceded that it would be
characteristic of him to do so.

Erdman responded by submitting a development plan ("Development Plan") to Weiss on March 12, 2007 that stated that the "Term Sheet" of the Development Plan is "intended to establish the basic terms surrounding the development of the Project . . . but should not be construed as including all the conditions and terms to which the Project will be subject." Ds. 9-15-10 App. 64. The Term Sheet was "intended to be binding on the Parties with respect to the terms set forth," and the parties were expected to "negotiate the definitive agreements in good faith within the context of the terms and conditions outlined" in the Term Sheet. *Id.* The Development Plan specifically provided that the Term Sheet would "supersede[] all previous conversations and negotiations between [Erdman and USMD] regarding this matter." *Id.* It also supplied terms concerning MOB II's ownership, parking construction rights, building parameters, lease and rent terms, fees owed, and conditions to construction. The Development Plan also explained that the MOB II project would "officially begin full development upon [USMD's] written approval of this Development Plan." *Id.* at 72. Weiss approved the Development Plan on March 29, 2007.

The parties also continued to negotiate for the purchase of MOB I as they progressed in their MOB II negotiations. Erdman found a potential third-party capital partner or buyer, Healthcare REIT ("HCN"), to participate in the acquisition of MOB I. On April 20, 2007 Erdman and USMD signed a letter of intent ("April Letter")

that outlined the general terms and conditions the parties expected to incorporate into a future definitive document regarding the sale of MOB I. The April Letter was understood "only to facilitate further discussion and negotiation and [was] *NOT* intended as a binding legal commitment." Ds. 9-15-10 App. 89. Although earlier proposals for acquisition involved lower prices (e.g., a January 30, 2007 offer proposed a $13.5 million price on the condition that Erdman would be the "developer of MOB II and other future development opportunities," Ps. 9-15-10 App. 66, the outline in the April Letter listed a $14.1 million price. It also outlined other terms regarding ownership, leasing requirements, and other matters.

Progress was halted on the MOB II project as MOB I negotiations broke down. Erdman and HCN conducted due diligence on MOB I during the summer of 2007. Erdman alleges that the results of its due diligence did not support the price for MOB I that USMD desired. Erdman continued to meet with HCN and USMD, however, in negotiations to reach a purchase agreement for MOB I. Specifically, on October 11, 2007, while preparing for an October 17, 2007 meeting among Erdman, HCN, and USMD to negotiate the terms of the MOB I acquisition, Weiss and Happ exchanged emails discussing an individual who they believed would present an obstacle to their goals for the meeting. As Happ explained the measures being taken regarding the individual, he reassured Weiss: "We are going to get this deal done." Ps. 9-15-10 App. 91. Sometime in the fall of

2007, Weiss informed Becker that, if Erdman did not get the MOB I deal done by the end of the year, USMD would sever its relationship with Erdman for both projects. When HCN was not responsive to attempts to close a deal by the end of 2007, Erdman terminated its relationship with HCN. Subsequently, in a December 20, 2007 email between Happ and Weiss, Erdman proposed to acquire MOB I for a $13.8 million total value price, but with certain compromises on other terms. USMD did not respond to this offer.

Happ sent an email on January 2, 2008 explaining Erdman's view of the breakdown in the negotiations. Weiss responded on January 9, 2008, countering with his version of the events and concluding that, given that no agreement was reached, USMD would "therefore evaluate all of [its] options." On January 14, 2008 Weiss informed Becker, "No need to go forward." Ps. 10-6-10 App. 71. On February 22, 2008 Happ sent Weiss an email expressing concern that the projects had been "on hold," asking whether to continue work on the project, and stating Erdman's expectation to be reimbursed if USMD discontinued the MOB II project. USMD was unable to find another potential purchaser for MOB I, and the MOB II project never reached the construction stage.

Erdman brings this lawsuit seeking to recover its lost fees and profits from the discontinued MOB II project. It alleges that USMD breached its contractual obligations under the September 25 Letter and the Development Plan by instructing Erdman to cease its

development activities, notifying Erdman that it was unilaterally terminating the MOB II project, failing to assign the letters of intent and deposits from those who had agreed to be tenants, and failing to proceed with the MOB II project. Alternatively, it alleges that USMD is estopped from denying oral assurances to reimburse or "make [Erdman] whole" for the expenses it incurred developing MOB II.

USMD asserts counterclaims for breach of contract, promissory estoppel, and negligent misrepresentation. It alleges that Erdman committed to a combined approach under which Erdman's right to develop MOB II was conditioned on its ability to purchase, or to find a purchaser for, MOB I. USMD maintains that Erdman promised to get the MOB I deal done according to the terms contemplated by the April Letter, and it violated the promise by failing to close by the end of 2007. USMD alleges that negligent misrepresentations were made regarding Erdman's expertise in handling projects such as MOB I and MOB II and concerning Erdman's ability to deliver a closed deal on MOB I in a timely manner. Both sides move for summary judgment.[3]

_____

[3]Erdman also moves for leave to correct its reply to USMD's summary judgment response. The court denies the motion because the proposed corrections to the reply and reply brief do not affect the resolution of Erdman's summary judgment motion. Erdman seeks to delete mention of a disputed fact from page 10 of the reply brief, *see* Ps. 10-20-10 Reply Br. 10 (alleging that employees of USMD and Erdman did not follow up on a USMD representative's oral promise), but this allegation has already been disregarded by the court because all disputed facts are being resolved in counterplaintiff

Where a party moves for summary judgment on a claim or counterclaim for which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of evidence to support the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at

---

USMD's favor in evaluating Erdman's summary judgment motion. Other than that, Erdman seeks to update citations to its disallowed reply appendix so that the citations now reflect the page numbers of the documents as they appear in the parties' allowed appendixes, and omit other citations that refer to documents in the reply appendix that were not included elsewhere in the summary judgment evidence. These changes do not affect the court's decision because the court has taken into account the evidence contained in the allowed appendixes and has disregarded evidence contained in the reply appendix alone.

1076.

III

The court considers first USMD's motion for summary judgment and Erdman's breach of contract claim.

A

Erdman's breach of contract claim arises from disputes over whether USMD legally obligated itself to pay for fees and services described in the September 25 Letter, the February Letter, and the Development Plan. Erdman alleges that USMD breached the contractual obligations by instructing Erdman to cease development activities, unilaterally terminating the MOB II project, failing to assign letters of intent and deposits from entities who had agreed to be tenants in MOB II, and failing to proceed with the MOB II project. It sues for damages from lost development fees, marketing and leasing fees, finance placement fees, and profits on the design-build portion of the project.

USMD maintains that it is entitled to summary judgment based on these grounds: (1) Erdman's damages claims are barred by the Statute of Frauds; (2) there is no enforceable contract requiring payment of Erdman's claimed damages; (3) the parol evidence rule prevents the use of extrinsic evidence to create a contract where none exists; (4) the Development Plan's merger clause precludes Erdman's claims; (5) conditions precedent for recovery have not been met; (6) Erdman made counteroffers that had the effect of

rejecting prior offers; and (7) there is no evidence that USMD breached the contract.

B

The court begins by addressing whether the Statute of Frauds applies and, if so, whether it effectively precludes the court from enforcing the parties' alleged commitments. The Texas Statute of Frauds requires covered promises or agreements to be in writing and signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. *See* Tex. Bus. & Com. Code Ann. § 26.01(a) (West 2009).

> [W]ith respect to the agreements defined [in § 26.01(b)], there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony.

*Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978) (citing *Wilson v. Fisher*, 188 S.W.2d 150 (1945)). Both sides agree that the Statute of Frauds applies under § 26.01(b) to the agreements concerning MOB II because Erdman's claims involve the execution of a 50-year ground lease and fees for construction of a building that would take more than one year to complete. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(5) and (6) (West 2009) (defining statute of frauds requirements to be applicable to "a lease of real estate for a term longer than one year" or "an agreement which is not to be performed within one year from the date of making the agreement");

- 13 -

Ds. 9-15-10 App. 59 (noting, in March 12, 2007 letter accompanying Erdman's Development Plan, goal of completing project by end of second quarter of 2008).

Although the parties agree that the Statute of Frauds applies, they disagree about whether it precludes enforcement of the obligations on which Erdman relies, considering that *Cohen* requires that the writing contain "all of the essential elements of the agreement." USMD contends that the written documents on which Erdman relies—the September 25 Letter, the February Letter, and the Development Plan—contain only preliminary, forward-looking expressions and indicate no present intent to be bound. *See Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 778 (Tex. App. 2009, pet. denied) ("Under Texas law, a writing that contemplates a contract or promise to be made in the future does not satisfy the requirements of the statute of frauds."). In particular, USMD notes that the written documents contain no provisions for damages for a breach, and it posits that, without such a term, the court cannot enforce the contract. Erdman responds that the documents indicate the parties' intent to be bound as to the essential terms, even if certain details were left for a future agreement. Erdman does not contest that the documents lack terms prescribing remedies for breach, but it argues that damages are not an essential term for purposes of determining enforceability.

Because determining whether an agreement is legally enforceable is a question of law, *see Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App. 2005, no pet.), the court can address this argument on summary judgment. The court holds that the Statute of Frauds does not bar enforcement of the September 25 Letter and the Development Plan.

The September 25 Letter and the Development Plan contain the essential elements of an agreement, as required under the Statute of Frauds. Not all terms need to be defined in an agreement, provided that an essential term is not left open for negotiation. *See Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 766 (Tex. App. 2004, no pet.) ("[P]arties may agree on some of the contractual terms, understanding them to be an agreement, and leave other contract terms to be made later."); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("Where an essential term is open for future negotiation, there is no binding cont[r]act.") The terms of the contract must be "sufficiently definite to enable a court to understand the parties' obligations." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Several courts have interpreted "essential" terms to include the names of the parties, the property at issue, time of performance, the price to be paid, the work to be done, and the service to be rendered. *See, e.g., Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010) (citing

*Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006) (noting that Texas courts generally construe essential terms of a contract to include some of the above terms)); *Engelman Irrigation Dist. v. Shields Bros.*, 960 S.W.2d 343, 352 (Tex. App. 1997, pet. denied) (citing *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App. 1992, writ denied); *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App. 1989, no writ)).

The parties disagree about whether the absence of a remedies provision makes the September 25 Letter and Development Plan too indefinite to be enforceable.[4] In support of its position, Erdman relies on the following definition of "essential term":

> An "essential" term is one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole.

*Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 485 (Tex. App. 2006, pet. denied) (citing *Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985)). But this definition cuts more in USMD's

---

[4]USMD also argues that the Development Plan contains no provisions obligating USMD to pay for fees before the formal contracts are finalized and MOB II is developed and built as planned. This argument is better addressed below, where the court analyzes whether the contract's terms create an obligation of the type Erdman posits, rather than here, where the court analyzes whether the contract as a whole is sufficiently definite to be enforceable under the Statute of Frauds.

favor.  A damages provision is not a part of the parties'
expectation as to "what would constitute sufficient *performance*,"
*id.* (emphasis added), because it provides a remedy in the event the
contract is breached.

The terms of the September 25 Letter and the Development Plan
that relate to *performance* are sufficient to enable the court to
understand the parties' obligations.  The September 25 Letter and
the Development Plan Term Sheet delineate the names of the
contracting parties, the property at issue, an expected time line
for performance, the rates and percentages at which fees are to be
paid to Erdman for marketing and leasing, development, and
financing placement, the equity interest in property to be
retained, the rents to be collected for the Ground Lease and Space
Lease, and the particular type of design and development work to be
done.  The court concludes that the September 25 Letter and the
Development Plan Term Sheet are sufficiently definite to be
enforceable under the Statute of Frauds.

Furthermore, although the September 25 Letter and the
Development Plan contain language that pertains to details to be
determined in a future definitive agreement,[5] they also include

---

[5]*See, e.g.*, Ds. 9-15-10 App. 59 ("Upon [USMD's] review and
approval of this Development Plan, [Erdman] look[s] forward to
finalizing the definitive agreements (i.e. Space Lease, Ground
Lease) in addition to formally engaging [Erdman] to design and
construct the new Building."); *id.* at 1 (describing  purpose of
September 25 Letter to be "to summarize the terms of the agreement
and describe the process for determining those terms where not

other terms that are intended to be binding immediately upon USMD's approval of the documents.[6]  Unlike in *Hartford*, where the parties anticipated future receipt of an "acceptable contract" before commencing performance, *see Hartford*, 287 S.W.3d at 775, no further action beyond acceptance was contemplated by the parties before the terms defined in the September 25 Letter and the Development Plan would be deemed binding.  The September 25 Letter states: "[USMD's] acceptance of [the September 25 Letter] . . . will serve as the binding agreement between our two parties until a formal development agreement is executed."  Ds. 9-15-10 App. 1.  This clearly and unambiguously reflects that USMD and Erdman intended the September 25 Letter to bind them at the moment of acceptance,

_____

currently defined").  The September 25 Letter also provides:

> This [Development Plan's] Term Sheet . . . is intended to establish the basic terms surrounding the development of the Project . . . but should not be construed as including all the conditions and terms to which the Project will be subject.  Such terms will be contained in the definitive agreements to be negotiated, executed, and delivered.

*Id.* at 64.

[6]*See, e.g.*, Ds. 9-15-10 App. 59 ("The following information [in the Development Plan] will serve as a comprehensive summary of the project as structured to date, including future schedules and outlines of terms *accepted thus far*." (emphasis added)); *id.* at 64 ("This Term Sheet is intended to be *binding on the parties with respect to the terms set forth herein* and the Parties agree to negotiate the definitive agreements in good faith within the context of the terms and conditions outlined in this Term Sheet." (emphasis added)).

*before* the negotiation of more formalized agreements. It may have been intended as an interim agreement, but it was intended to be binding nonetheless. Therefore, the fact that further negotiations were contemplated does not detract from the binding effect of the agreements in the September 25 Letter and the Development Plan. It follows from the language quoted above——that the terms outlined in the September 25 Letter had binding effect until the parties agreed on the superseding Development Plan——and the terms outlined in the Development Plan bound the parties from that point forward. *See id.* at 64 ("This [Development Plan] Term Sheet supersedes all previous conversations and negotiations between the Parties regarding this matter [i.e., the MOB II project].").[7] "Where the intent of the parties to be bound (or not) is clear and unambiguous on the face of an agreement, that intent may be determined as a matter of law." *Opus S. Corp. v. Limestone Constr., Inc.*, 2003 WL 22329033, at *5 (N.D. Tex. Oct. 6, 2003) (Fish, C.J.) (citing *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 16 (Tex. App. 2000, pet. denied)). Erdman has therefore established that the Statute of Frauds does not bar the enforcement of the September 25 Letter and the Development Plan Term Sheet. The court holds as a matter

---

[7]Also, as noted in the Development Plan, any future definitive agreement would still be negotiated in good faith "*within* the context of the terms and conditions outlined in this Term Sheet." Ds. 9-15-10 App. 64 (emphasis added). Thus it does not appear that the terms established in the Development Plan's Term Sheet were intended to be contingent on future agreements.

of law that the parties intended to be bound by the terms outlined in these documents.

The court need not address whether the parties reached an agreement under the February Letter or intended that the letter have binding effect. As the court holds below, the terms of the Development Plan superseded the February letter. *See infra* § III(C)(1).

C

Because the Statute of Frauds does not bar enforcement of the September 25 Letter and the Development Plan Term Sheet, the court next considers whether the terms of these documents permit Erdman to recover. In addressing this question, the court considers four of USMD's arguments together: the Development Plan's merger clause precludes the court's consideration of any negotiations prior to the Development Plan Term Sheet; there is no evidence of a breach; conditions precedent have not been met to merit a damages award; and no enforceable contract exists regarding damages.

1

USMD argues that only the Development Plan governs the obligations of the parties because it supersedes all prior oral and written agreements. The Development Plan Term Sheet, which came after the September 25 Letter and the conversations between USMD and Erdman representatives in January and February of 2007, provides, in pertinent part:

> This Term Sheet is intended to be binding on
> the Parties with respect to the terms set
> forth herein and the Parties agree to
> negotiate definitive agreements in good faith
> within the context of the terms and conditions
> outlined in this Term Sheet. This Term Sheet
> supersedes all previous conversations and
> negotiations between the Parties regarding
> this matter.

Ds. 9-15-10 App. 64.

Although this provision does not operate as a true merger clause rendering the Term Sheet finalized and complete,[8] it does unequivocally establish that all prior negotiations regarding the development of MOB II are superseded and no longer have legal effect. Erdman does not contest the applicability of the superseding clause; indeed, it cannot challenge the binding effect of this clause without calling into question whether the Development Plan Term Sheet is itself a binding contract. The court holds that the Development Plan Term Sheet supersedes all prior negotiations, and it only considers this document in evaluating the breach of contract claim.

2

Next, the court addresses USMD's argument that, even if a contract exists, USMD did not breach any of its obligations. Erdman seeks to recover rents, fees, and lost design-build profits from

---

[8]The Term Sheet states: "[The Term Sheet] should not be construed as including all the conditions and terms to which the Project will be subject," Ds. 9-15-10 App. 64, and envisions that the parties will supplement the terms established in the Term Sheet with others in a future formal development agreement.

USMD. The Term Sheet grants Erdman certain development and ownership rights in MOB II: the construction of landscaping and a parking area for the building, partial ownership of MOB II via the Ownership Entity, and entitlement to certain predetermined rates for rent, marketing and leasing fees, development fees, and financing placement fees. Notably, however, the Term Sheet differs from the superseded September 25 Letter in that it lacks any terms that compel USMD to select Erdman for the construction of the building itself. *Compare* Ds. 9-15-10 App. 71 (providing in Development Plan some "estimate[s]" of the hard and soft costs involved if Erdman were to handle building's construction and development, but not requiring that Erdman be selected to provide such services) *with id.* at 2 (providing in September 25 Letter that "[Marshall Erdman Development, LLC] will design and construct" MOB II, and stating, "Both parties understand that Marshall Erdman & Associates will be the firm that renders the design and construction services to [Marshall Erdman Development, LLC] for this project.").

The omission of a general provision granting construction rights for the entire project does not appear to be an oversight. Where the parties intended to commit to using Erdman to construct particular components, they were specific. *See, e.g.*, *id.* at 65 (identifying with particularity that "[Erdman] will construct new landscaping, right of ways, and a new surface parking area," rather

than granting all construction rights).  Although the Development Plan's Executive Summary states that USMD "engaged" Erdman to "analyze, develop, finance, design, construct, and provide the third-party ownership entity . . . to own/manage the approximately 120,000 square foot new building development [i.e., MOB II]," Ds. 9-15-10 App. 61, the past-tense statement is qualified by the present-tense statement that follows: "The Development Plan package explains the scope, feasibility and proposed terms of the [P]roject and outlines the Developer's recommendations for moving the Project into the final Design and Construction Phase of project development." *Id.*  The change in tense indicates that the first statement merely summarizes the parties' earlier understanding from their letters of intent that Erdman would provide construction services for MOB II's development, without creating new obligations or even necessarily reaffirming old ones.  The second statement in the present tense indicates that the superseding agreement under the Development Plan "explains the scope" of the project, suggesting that the new agreement may place some limits on the extent of construction services contemplated.  When the Executive Summary is viewed in context with the Term Sheet——which goes so far as to drop the language from the September 25 Letter that identified Erdman as the firm that would provide design and construction services for MOB II, even though the Term Sheet retained and elaborated on many other terms from the September 25

Letter——the Term Sheet cannot be read to contain an implied grant of design-build rights to Erdman.[9]

The court concludes that the Development Plan Term Sheet contains sufficiently definite terms with respect to the ownership rights, marketing and leasing fees, development fees, financing placement fees, and rents from the Ground Lease and Space Lease to form a basis for recovery of profits from fees, rents, and construction of the landscaping, parking, and rights of way. But the Development Plans Term Sheet cannot support a claim for damages arising from the costs of construction or lost profits from the design-build portion of the building itself (apart from the fees described above) because the Term Sheet contains no enforceable agreement regarding these matters.

As evidence of breach, Erdman presents deposition testimony

---

[9]At best, the development budget described in the Term Sheet includes costs of construction, *id.* at 71, the Feasibility Report attached to the Term Sheet includes costs of construction in Erdman's projected budget, *id.* at 73, and the Feasibility Report assumes that, during the design phase, Erdman will create suite plans for MOB II's tenants, *id.* at 74. But these estimates and projections of construction costs from the Feasibility Report, in contrast to the specific terms in the Term Sheet laying out in mandatory language the fees, rents, ownership rights due to the parties, and Erdman's right to construct landscaping and parking, give no indication of a binding obligation to pay a set amount for building construction services or even an obligation to appoint Erdman as the firm to handle the construction. Such tentative estimates and assumptions prescribing no obligations of conduct (and therefore no standard by which the court may identify breach) cannot be considered as among the binding provisions of the Term Sheet.

suggesting that USMD attempted to repudiate these Term Sheet obligations. *See id.* at 47 (recounting in deposition of Erdman representative that USMD representative expressed intent to evaluate other options and go in different direction); Ps. 10-6-10 App. 71 (indicating, in January 14, 2008 email from USMD representative to Erdman representative, USMD's response to Erdman's query on how to proceed as "[n]o need to go forward"). Such a repudiation before the time of performance could constitute a breach under Texas law. *See Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995) (per curiam) ("We have long recognized the rule of anticipatory breach: the repudiation of a contract before the time of performance has arrived amounts to a tender of breach of the entire contract and allows the injured party to immediately pursue an action for damages." (citing *Pollack v. Pollack*, 46 S.W.2d 292, 293 (Tex. 1932)). Moreover, according to Happ's testimony, USMD presented a proposal in March 2008 essentially offering Erdman the same terms to which it would have been entitled under the original Development Plan Term Sheet, but at a higher price—that is, the purchase of MOB I. Although USMD maintains that this March 2008 conversation is evidence that negotiations for consideration were still ongoing, the conversation could just as easily be interpreted by a reasonable jury as evidence of USMD's attempt to renege on an earlier binding agreement for the purpose of demanding more from Erdman, without

consideration.  Accordingly, there is a genuine issue of material fact whether a unilateral anticipatory breach occurred in January 2008 and whether the March 2008 conversation should be construed as further evidence of such a breach.

3

USMD also maintains that Erdman cannot meet its burden of proving that all conditions precedent have been satisfied.  *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

The Term Sheet conditions the start of construction on the occurrence of the following six milestones (the "Pre-Construction Milestones"): (1) Approved Development Plan; (2) Executed Ground Lease; (3) Achieve Pre-Leasing Requirements (70-75% Pre-Leased); (4) Final Building Program and Design; (5) Site and Construction Permits; and (6) Close on Project Financing.  USMD points to deposition evidence that indicates that the parties never executed a Ground Lease, that the 70% pre-leasing requirement was never met, and that there was never a closing on project financing.  Erdman concedes that the conditions were not met, but it maintains that the conditions were only prerequisites to construction and that they do not obviate the development obligations under the Term Sheet that are unrelated to construction.  Erdman also argues that USMD, by instructing it to cease all work, terminated its relationship with Erdman and precluded any possibility of the

parties' satisfying the preconditions to Erdman's performance. Erdman maintains that USMD should be held responsible for unilaterally making performance impossible, noting that, in Texas, "if one party prevents the other from performing a condition precedent, then the condition is 'considered as fulfilled.'" *Donaldson v. Digital Gen. Sys.*, 168 S.W.3d 909, 916 (Tex. App. 2005, pet. denied) (citing *Houston Cnty. v. Leo L. Landauer & Assocs., Inc.*, 424 S.W.2d 458, 464 (Tex. Civ. App. 1968, writ ref'd n.r.e.); *Miller v. Hodges*, 260 S.W. 168, 172 (Tex. Civ. App. 1924, judgm't adopted)); *Ebberts v. Carpenter Prod. Co.*, 256 S.W.2d 601, 618 (Tex. Civ. App. 1953, writ ref'd n.r.e.) (describing as a "well settled principle" that "a party to a contract, who by his own act prevents the happening of a condition, is estopped thereafter to say that such condition has not happened"); *cf.* 15 Richard A. Lord, *Williston on Contracts* § 47:4 (4th ed. 2010) ("It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.").

While the Pre-Construction Milestones are not express preconditions to the other obligations in the Term Sheet, the failure to meet certain milestones could render some of the other Term Sheet obligations impossible for Erdman to complete on its own. For example, without an executed ground lease, Erdman could

not be designated as the "leasing agent of record," and it would never be able to recover the "Leasing Fee . . . payable upon lease execution." Ds. 9-15-10 App. 71. Without a lease or other arrangement from USMD, Erdman could not construct parking spaces or install landscaping on USMD's property, as required in the Term Sheet. If USMD were to discontinue the Project, Erdman would not be able to obtain financing for a project that no longer existed. Therefore, if, as alleged in the deposition testimony and supported by the January 14, 2008 email, USMD directly prevented Erdman from moving forward on the contract by instructing Erdman to cease all work and discontinuing its negotiations for leasing of the property, USMD would be precluded from complaining that Erdman failed to fulfill its end of the bargain. As explained above, there is a genuine issue of material fact whether USMD breached first by its anticipatory repudiation and direct hindrance of completion of the conditions precedent, refusing to follow up on the preliminary steps needed for Erdman to move forward on leases, financing, or construction. If USMD repudiated the contract, Erdman was not required to attempt to perform its contractual obligations; it was permitted to pursue immediately an action for damages on the breach. *See Murray*, 900 S.W.2d at 344; *Glass v. Anderson*, 596 S.W.2d 507, 510 (Tex. 1980) (giving injured party choice to sue immediately upon anticipatory breach or wait until time of performance). As such, the unfulfilled conditions

precedent do not prevent Erdman from recovering from USMD for breach of contract.

The foregoing stands or falls, however, on the factual question whether USMD breached first and prevented Erdman from further performance. USMD maintains that the January 2008 email should not be construed out of context, and it counters that Erdman reneged on the established agreement first. As support, USMD points to the April Letter (dated April 20, 2007), which allegedly supersedes the Development Plan Term Sheet (dated March 12, 2007). USMD posits that the April Letter is evidence of the parties' agreement on a new "combined approach" package deal in which Erdman committed to purchase MOB I for $14.1 million in exchange for development and construction rights for MOB II. USMD alleges that Erdman backed out of the deal by proposing in a December 20, 2007 email[10] a "radically new combined approach" that would require USMD to guarantee rents from MOB II and sell rather than lease its land in exchange for purchase of MOB I at a $13.8 million price.

The court has located nothing in the cited evidence that suggests that the parties came to an agreement on the "combined approach" and superseded the Development Plan Term Sheet. The

---

[10]USMD asserts that Erdman told USMD it would not comply with the April Letter "[n]ear the end of 2008." Ds. 10-20-10 Reply 7. The court assumes, however, that USMD means near the end of 2007 because the next sentence in the reply states that "Erdman then drafted yet another LOI with a radically new combined approach," and it cites an exhibit dated December 20, 2007.

April Letter and accompanying annexes do not mention a medical office building other than MOB I, and they appear to be nothing more than a straightforward sales proposal for MOB I alone. Furthermore, the April Letter clearly indicates "this letter is provided only to facilitate further discussion and negotiation and is NOT intended as a binding legal commitment by [Erdman] or USMD to consummate the sale/purchase/lease of the MOB or to enter into the [purchase and sale agreement, ground lease, and related documents] or any other agreement." Ds. 9-15-10 App. 89; Ps. 9-15-10 App. 55; *see also* Ds. 9-15-10 App. 94 (noting that nothing in April Letter is intended to create binding legal obligations, other than paragraph that specifically disclaims any interim offers or representations until execution of definitive purchase and sale agreement, ground lease, and related documents). This stands in stark contrast to the Development Plan Term Sheet, which expressly provides that the terms within are "intended to be binding," *id.* at 64, and that any subsequent definitive documents would have to be negotiated within the context of the terms and conditions already defined in the Term Sheet. Given this context, a reasonable jury could not find that the December 20, 2007 email from Erdman was a repudiation or breach because USMD has not presented evidence of an agreement on the MOB I sale terms. Without evidence of an agreement, the December 20, 2007 email could only reasonably be construed as a counteroffer on MOB I following on the heels of the

offer in the April Letter. Without any evidence of Erdman's and USMD's intent to be bound by the parties' negotiations leveraging MOB II terms to facilitate the MOB I sale, the Development Plan Term Sheet remains the controlling document with respect to MOB II. Therefore, it is an unresolved question for trial whether USMD breached the Development Plan Term Sheet first by repudiation, making the fulfillment of conditions precedent by Erdman unnecessary.

4

USMD also challenges the damages Erdman seeks for breach of contract by pointing to the lack of any contractual provision requiring USMD to cover the cost of Erdman's fees. *Cf.* Ds. 10-6-10 App. 74 (relating Weiss's testimony that he interpreted the Development Plan as Erdman's project, with no mention of USMD, since the ownership entity would be comprised of Erdman and the physicians themselves). Erdman counters that it is not seeking to enforce an express contractual damages provision, but rather is seeking recovery on a lost profits theory. In seeking "lost profits," Erdman essentially asks the court for expectation damages——"benefit of the bargain damages that restore the non-breaching party to the same position it would have been in had the contract not been breached." *Wes-Tex Tank Rental, Inc. v. Pioneer Natural Res. USA, Inc.*, 327 S.W.3d 316, 320 n.4 (Tex. App. 2010, no pet.) (citing *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882,

888-89 (Tex. App. 2004, pet. denied)).  Because USMD's breach would have been the direct cause of Erdman's losses in fees and profits, USMD would be responsible for expectation damages——the forgone profits and fees Erdman would have obtained had the contract been fully performed on both sides——even if, absent breach, these profits would have been paid for by someone else.  Once a breach is shown, Erdman need not point to any provision in the Development Plan requiring USMD, specifically, to pay Erdman for fees and rents.  The Development Plan may have required a different entity——a single-purpose entity owned by Erdman and a group of physician tenants ("Ownership Entity")——to be responsible for certain fees if the MOB II project had gone forward as planned. But once USMD's breach directly caused Erdman to lose the profits it expected from the venture, it became USMD's responsibility to pay expectation damages arising out of the breach in order to make Erdman whole.

Despite the availability of some type of expectation damages, Erdman cannot recover all of the damages it seeks.  First, an award of expectation damages requires the court to discount Erdman's fee award by the amount that, due to the breach, Erdman was excused from spending.  Second, the fees would not have gone wholly to Erdman had the contract not been breached; they would have gone to the Ownership Entity, and Erdman would have been required to share the fees with others with an interest in the Ownership Entity.

Awarding Erdman the full value of the fees claimed would place it in a better position than it would have been in had USMD fulfilled the contract. Furthermore, Erdman seeks recovery for development fees, marketing and leasing fees, finance placement fees, and design-build profits, but the Development Plan Term Sheet contains no definite terms of agreement indicating that USMD was legally obligated to retain Erdman for the design-build contract. The Development Plans Term Sheet specified the rates and percentages at which the leasing fees, development fees, and financing placement fees would be assessed. By contrast, the Development Plan's Term Sheet contains only projections and estimates of non-fee-related design-build costs and lacks any explanation of who will pay for these costs or to whom the money will be due. Although Erdman provided budgeting services and feasibility studies to prepare the Development Plan, the Development Plan Term Sheet imposed no requirement that Erdman subsequently be selected for the projected design-build services in the plan or be compensated for the prior work. Given that Erdman's selection for design-build work was not certain or required under the contract terms, Erdman cannot recover profits for design-build services, and expectation damages are confined to the fees and rents set out in the Term Sheet.[11]

---

[11]To be clear, the reason for disallowing recovery of design-build profits is not the uncertainty of the projected figures in the budget, but the uncertainty under the contract as to whether Erdman would be entitled to these profits in the first place, regardless of amount. *See ERI Consulting Eng'rs, Inc. v. Swinnea*,

D

The remainder of USMD's arguments——on the inappropriateness of extrinsic evidence under the parol evidence rule and Erdman's alleged counteroffer——do not change the court's conclusions. The parol evidence argument is mooted by Erdman's admission that it does not rely on parol evidence to support its breach of contract claim. In reaching its decision above, the court applied the Development Plan's merger clause and relied solely on the Development Plan Term Sheet to interpret the parties' contractual obligations.[12] Finally, Erdman's December 20, 2007 email offering a higher price for MOB I in exchange for USMD's taking on additional obligations on MOB II does not constitute a counteroffer because the Development Plan Term Sheet had already been accepted by both parties as a binding agreement long before December 2007. "A counteroffer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." *Thurmond v. Wieser*, 699 S.W.2d 680, 682 (Tex. App. 1985, no writ). An unaccepted counteroffer cannot obviate a preexisting binding agreement.

---

318 S.W.3d 867, 877 (Tex. 2010) ("[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." (quoting *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938))).

[12]*See supra* § III(C)(1).

Accordingly, the court grants in part and denies in part USMD's motion for summary judgment on the breach of contract claim.

USMD's motion for summary judgment on the breach of contract claim is denied to the extent Erdman seeks to recover the profits expected from the construction of landscaping, rights of way, and a surface parking area, and the fees, rents, and ownership rights specifically mentioned in the Term Sheet. A reasonable jury could only find that the Development Plan Term Sheet constitutes an enforceable contract between Erdman and USMD and, by its terms, the Development Plan Term Sheet could entitle Erdman to damages based on that profit expectation. There is a genuine issue of material fact whether such lost profits alleged were sufficiently reasonably certain to support a damages award. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (noting that what constitutes "reasonably certain evidence of lost profits" is a "fact-intensive determination").

USMD's motion for summary judgment on the breach of contract claim is granted, however, to the extent Erdman seeks design-build profits because the Term Sheet does not promise to award Erdman a design-build contract.

IV

Having determined that there is an enforceable contract to support Erdman's request for relief, the court need only address Erdman's promissory estoppel claim to the extent it relies on promissory estoppel to recover profits not covered under the contract: i.e., design-build service profits.

A

Under Texas law, promissory estoppel is "defensive in that it estops a promisor from denying the enforceability of the promise." *"Moore" Burger, Inc. v. Phillips Petrol. Co.*, 492 S.W.2d 934, 936 (Tex. 1972). As stated in *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783 (Tex. 1988), "[w]aiver and estoppel are defensive in nature and operate to prevent the loss of existing rights. They do not operate to create liability where it does not otherwise exist." *Id.* at 785 (quoting *Jones v. Tex. Gulf Sulphur Co.*, 397 S.W.2d 304, 307 (Tex. Civ. App. 1965, writ ref'd n.r.e.)). The doctrine of promissory estoppel does not "'create a contract where none existed before.'" *"Moore" Burger*, 492 S.W.2d at 936. Because promissory estoppel only prevents losses for acts done in detrimental reliance on a promise, rather than by creating an enforceable contract, Erdman cannot establish a claim for expectation damages for design-build services that it did not render; it can only recover compensation for costs already expended in reliance.

> [Under promissory estoppel,] losses of
> expected profits will not be allowed even if
> expected profits are provable with certainty
> . . . . [W]here there is actually no contract
> the promissory estoppel theory may be invoked,
> thereby supplying a remedy which will enable
> the injured party to be compensated for his
> foreseeable, definite and substantial
> reliance.

*Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965). Texas courts permit recovery under promissory estoppel when the following elements are met: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment," *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983), and (4) "a definite finding that injustice can be avoided only by the enforcement of the promise," *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 137 (Tex. App. 1993, writ denied) (citing *Fretz Constr. Co. v. S. Nat'l Bank*, 600 S.W.2d 878, 881 (Tex. Civ. App. 1980), *rev'd and remanded on other grounds*, 626 S.W.2d 478 (Tex. 1982)).

### B

The court begins by defining the scope of the reliance costs at issue. Erdman bases its promissory estoppel claim on a personal conversation between USMD's Weiss and Erdman's Becker in December 2006 and a January 29, 2007 telephone conversation between Weiss and Erdman's Happ. According to Becker's deposition testimony, during the December 2006 meeting, Weiss told him and other Erdman representatives: "I don't want anything to hold up MOB II. If we

sell MOB I to somebody else and that individual's going to develop MOB II, you know that we would buy you out, or if we stopped it, we would pay you for that." Ps. 10-6-10 App. 12b. According to Happ, Weiss promised during a January 29, 2007 telephone conversation to "make [Erdman] whole for costs if the project went away," Ds. 9-15-10 App. 31, or if USMD chose to "go in another direction," *id.* Any costs not otherwise covered in the scope of the Development Plan Term Sheet contract and predating the December 2006 conversation do not come within the scope of the promissory estoppel claim because such costs could not have been incurred in reliance on either the December 2006 conversation or the January 29, 2007 conversation. Also, both conversations predate the Development Plan Term Sheet, which provides that all earlier negotiations and conversations are superseded. As such, any reliance damages incurred after March 29, 2007—when the Development Plan Term Sheet was approved—would be governed by the terms of that contract. Therefore, the court limits its analysis of damages that Erdman seeks under its promissory estoppel claim to costs incurred between the date of the December 2006 conversation and March 29, 2007.

C

The court now considers whether a reasonable jury could find in Erdman's favor on its promissory estoppel claim to the extent it is based on costs incurred during the relevant period.

USMD maintains that Weiss's alleged promises are too vague to

induce reasonable reliance. *See Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 108 (Tex. App. 1987, writ ref'd n.r.e.) ("[E]stoppel requires a *reasonable* or *justified* reliance on the conduct or statements of the person sought to be estopped by the person seeking the benefit of the doctrine."); *Frost Crushed Stone Co. v. Odell Geer Constr. Co.*, 110 S.W.3d 41, 44-45 (Tex. App. 2002, no pet.) ("A central element of promissory estoppel is detrimental reliance. Reliance on the promise must be reasonable and justified." (citations omitted)); *Kuehne v. Denson*, 219 S.W.2d 1006, 1008 (Tex. 1949) (requiring showing that party invoking estoppel had "right to rely" on another's statements). Whether reliance is reasonable is generally a question of fact, and the summary judgment standard requires a showing that reliance was unreasonable as a matter of law. *Hall v. Harris Cnty. Water Control & Improv. Dist. No. 50*, 683 S.W.2d 863, 868 (Tex. App. 1984, no pet.).

The court holds that a reasonable jury could find that Erdman reasonably and justifiably relied on Weiss's alleged promises in the December 2006 conversation to "buy [Erdman] out." In the context in which this statement was allegedly made, Erdman could reasonably and justifiably have understood that Weiss was saying that he did not want anything to hold up the MOB II project, and he specifically did not want Erdman to stop working on MOB II due to concerns that USMD would sell MOB I to someone else and give that

purchaser the right to develop MOB II.  Therefore, he specifically told Erdman representatives that if USMD *did* sell MOB I to someone else and confer on the purchaser the right to develop MOB II, USMD would make Erdman whole for its costs incurred.  A reasonable jury could find that Weiss intended to ensure continued progress on the development of MOB II by assuring Erdman that it would not be at risk for the costs it was incurring.

Likewise, a reasonable jury could find that the January 29, 2007 conversation induced justifiable reliance.  Assuming that Happ's testimony is true, Weiss essentially repeated that same promise that he had made in December: USMD would make Erdman whole for the costs it was incurring if it were not given the right to develop MOB II.

D

In sum, Erdman's breach of contract is limited to the extent it seeks to recover on the expected profits from promises expressly stated in the Development Plan Term Sheet.  Its claim for promissory estoppel is limited to costs incurred between the date of the December 2006 conversation and March 29, 2007 in justifiable reliance.  USMD is entitled to summary judgment dismissing the balance of Erdman's claims for breach of contract and promissory estoppel.

V

The court now considers Erdman's motion for summary judgment.

A

USMD alleges that Erdman breached its contractual obligations to purchase MOB I at an agreed-upon price and/or to find a willing buyer to purchase MOB I at an agreed-upon price. To prevail on this breach of contract counterclaim, USMD must establish (1) the existence of a valid contract, (2) that USMD performed its duties under the contract, (3) that Erdman breached the contract, and (4) that USMD suffered damages as a result of the breach. *E.g., Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003) (Texas law). Erdman maintains that it and USMD did not have a valid contract regarding the purchase of MOB I. For there to be a valid contract, there must be "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Prime Prods. v. S.S.I. Plastics*, 97 S.W.3d 631, 636 (Tex. App. 2002, pet. denied) (citing *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App. 2000, no pet.)). Erdman counters that there was no meeting of the minds on the subject of purchasing MOB I.

USMD has failed to adduce evidence that would permit a reasonable jury to find that there was a meeting of the minds regarding the terms of MOB I's purchase. USMD's response brief

omits all discussion of its breach of contract counterclaim, and the response itself only provides the conclusory statement that "the parties entered into an agreement whereby Erdman agreed to purchase MOB I at an agreed-upon price and/or find a willing buyer to purchase MOB I at an agreed-upon price." Ds. 10-6-10 Resp. ¶ 1.5. USMD's response and brief do not identify what documents it construes as binding agreements, but the pleadings suggest that USMD intends to rely on the December Letter and the April Letter. The December Letter, as drafted, contemplated two options for pricing the purchase of MOB I and a 120-day exclusivity period where Erdman would have the sole right to purchase MOB I, starting on the date of the letter's execution. Yet Erdman alleges, and USMD acknowledges, that the December Letter was never signed and returned. Without evidence of acceptance, a reasonable jury could not find that the December Letter is a contract.[13] Nor could a reasonable jury find that the April Letter is a contract because the letter states that "this letter is provided only to facilitate further discussion and negotiation and is *NOT* intended as a binding legal commitment by [Erdman] or USMD to consummate the sale/purchase/lease of [MOB I] or to enter into the Definitive Documentation or any other agreement." Ps. 9-15-10 App. 55. And

---

[13]In fact, the February 20, 2007 letter from USMD to Erdman states: "At this time we are not prepared to accept your terms for acquisition of the medical office building." Ds. 9-15-10 App. 57. This indicates that the parties had not reached an agreement regarding the earlier December Letter proposal.

if USMD seeks to enforce an oral agreement, the Statute of Frauds would preclude enforcement of the contract because the transaction would involve a sale of real estate. *See* Tex. Bus. & Com. Code Ann. § 26.01(a) (West 2009).

Because a reasonable jury could not find that Erdman had a contractual obligation to purchase MOB I, USMD's breach of contract counterclaim must be dismissed as well.

B

USMD asserts a counterclaim for promissory estoppel, alleging that it detrimentally relied on Erdman's promise to "move forward with the acquisition and/or sale of MOB I" and "to proceed with that acquisition and/or sale within a specific time frame and at a given price." 2d Am. Answer ¶ 78. As noted above, promissory estoppel has four elements: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment," *English*, 660 S.W.2d at 524, and (4) "a definite finding that injustice can be avoided only by enforcement of the promise," *City of Beaumont*, 870 S.W.2d at 137 (citing *Fretz Constr. Co.*, 600 S.W.2d at 881).

Erdman moves for summary judgment on the following grounds: USMD cannot establish that Erdman made a promise to move forward with the MOB I acquisition within a specific time frame and at a given price; it would not have been foreseeable to Erdman that USMD would rely on Erdman's vague statements expressing a desire to

purchase MOB I; and USMD cannot establish that it relied to its detriment on any of Erdman's alleged promises. USMD cites in support an exchange of emails that occurred between USMD's Weiss and Erdman's Happ on October 11, 2007 and a December 20, 2007 email from Happ to Weiss.[14] In the October 11, 2007 email exchange, Happ discussed with Weiss whether Weiss should attend an upcoming meeting on the purchase of MOB I. Happ stated: "I think it is necessary that you are available for this meeting in order to make some decisions if we can't come to some agreement." Ds. 10-6-10 App. 95. When Weiss responded that he would attend, Happ replied that "Dan Loftus" ("Loftus") was also scheduled to attend, explaining: "This is the guy [who] ruffled your feathers and mine during one of our conference calls . . . . I am concerned about having the both of you in the same room." Happ also expressed a preference that Weiss simply be "available" rather than present at the meeting. *Id.* When Weiss replied, "You're kidding?" Happ confirmed he that was "[n]ot kidding." But he also reassured Weiss that

> [i]f Dan is there, I feel that I can handle Dan and the situation to make good progress. I also have three of the executives at HCN available to call in case we run into any obstacles. HCN is checking into making sure Dan is either aligned or he will be switched out for someone else. We are going to get

---

[14]In evaluating the parties' arguments, the court resolves all facts in USMD's favor and assumes that Erdman made all of the alleged statements on which USMD relies. *See supra* note 1.

this deal done.  I will call you tomorrow to discuss.

*Id.*  In the December 20, 2007 email, Happ summarized the "basic terms" of the proposal that Erdman had put together for MOB I's acquisition.  Ds. 9-15-10 App. 96.  Happ's email contains this statement: "We fully expect to close on MOB I in January."  *Id.* USMD construes Happ's statements——"We are going to get this deal done," and, "We fully expect to close on MOB I in January"——to estop Erdman from denying responsibility for damages arising from USMD's inability to sell MOB I.

The court holds that a reasonable jury could only find that such statements were expressions of hope or expectation and are too vague on key terms to form a basis for reasonable and foreseeable reliance.  *See Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 142 (Tex. App. 1999, pet. denied) (holding that reliance on promise to provide equipment was unreasonable as a matter of law because there was no definite promise of specific items of equipment); *Collins v. Allied Pharmacy Mgmt., Inc.,* 871 S.W.2d 929, 937-38 (Tex. App. 1994, no writ) (concluding that promissory estoppel was unavailable as a matter of law in suit for continued employment where agreement did not define time frame for commitment or clear limits on employer's actions because such promises were illusory and reliance was based on subjective expectations); *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 568 (Tex. App. 1989, no writ) (affirming summary judgment because promises to build addition to hospital

facility, upgrade, and raise level of patient care were too indefinite). Even if, as USMD contends in its response brief, the project was progressing along quickly——due diligence was underway, a potential third-party capital partner had been courted, and things had progressed to the point where Erdman was willing to allow USMD and the third-party capital partner to work directly with each other in pursuing the acquisition of MOB I——the general positive momentum of the negotiations at the time of the statements does not counter the context of uncertainty in which the statements were made. The statement from the October 11, 2007 email conversation that "We are going to get this deal done" occurred in this context: earlier that day, just four email interchanges earlier in the same conversation, Happ expressed concern that Weiss would need to be available for the meeting to make some decisions "if we can't come to some agreement." Ds. 10-6-10 App. 95. Happ expressed concern that Loftus' presence at the meeting would impede progress, and he described tentative attempts to get Loftus either switched out or aligned with the deal, but explained that he was "not sure if that is going to be possible." USMD characterizes the prospect of agreement to be more certain than it actually was, alleging that Happ promised that HCN would "make sure" an individual opposing agreement would be switched out or aligned to their interests, when a reasonable jury could only find that Happ actually said no more than that HCN was "checking into" making sure

that this individual was aligned or switched out.

Furthermore, whatever "We are going to get this deal done" may mean, a reasonable jury could not find that it meant a promise to deliver an agreement to proceed within a "specific time frame" or at a "given price," as USMD maintains. *See* 2d Am. Answer ¶ 78. There is no evidence that USMD and Erdman reached an agreement on price and time frame at the time of the October 11, 2007 conversation. It cannot reasonably be inferred that every price or method of payment would be acceptable; otherwise, Erdman and USMD would have already worked out a deal based on Erdman's earlier proposals. *Compare* Ps. 9-15-10 App. 49 (indicating that Erdman proposed two price options for purchase of MOB I on December 29, 2006) *with id.* at 17 (expressing in February 20, 2007 letter to Erdman that USMD was not prepared to accept any of Erdman's proposals). In fact, the April Letter——the one document signed by both parties mentioning a price and time frame for MOB I——had never progressed past the non-binding stage of being a document "only to facilitate discussion and negotiation." Moreover, the time frame for closing mentioned in the document ("on or before June 15, 2007," *id.* at 58) had passed months before, and the letter of intent had been revised several times shortly before the October 11, 2007 conversation, suggesting that the parties were still negotiating the terms of a mutually acceptable deal. *See id.* at 97-107 (documenting in series of emails between Erdman and USMD

representatives dated shortly before October 11, 2007 conversation the various points of negotiation remaining among Erdman, USMD, and HCN). A reasonable jury could not find that USMD justifiably relied on an isolated statement, contextually surrounded by multiple expressions of concern regarding potential obstacles to agreement and involving negotiations with a third party, as a promise. Such a promise would evince a significant change from Happ's earlier uncertainty, especially given that the underlying obstacles to agreement that initially caused his concerns remained unresolved at the time of the alleged promise.

USMD's brief appears to retreat from the position taken in its pleadings regarding "a specific time frame" and "a given price," only going as far as to characterize Happ's statement as a "reassurance to USMD that the deal they were brokering for the purchase of MOB I was on track." Ds. 10-6-10 Br. 18. Even so, a reasonable jury could not find Happ's statements to be a promise that a satisfactory agreement would be reached. It was still unreasonable for USMD to react to a party's reassurance that the "sale was on track to go through and be completed," *id.* at 19, by calling off all negotiations with competing bidders. Even if the project was "on track" and the one offering the assurance was knowledgeable after six months of due diligence, there were many uncertainties and essential terms still up for negotiation, such as price.

Turning next to the December 20, 2007 email, a reasonable jury could only find that Happ's statement that "We fully expect to close on MOB I in January" was merely an unenforceable statement of expectation. *See Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 305 (Tex. App. 2009, no pet.) (requiring promise to be more than expectation to sustain claim under promissory estoppel). Here, just as in the October 11, 2007 conversation, Happ's email contains various expressions of uncertainty, such as over USMD's willingness to go along. *See* P. 9-15-10 App. 95 ("Please note that I and our team firmly believe that we are presenting you with the maximum value for MOB I . . . . This is something that you may not appreciate hearing but we think it is the reality of the situation."). It also expresses uncertainty on price and feasibility. *See id.* ("In order to facilitate getting USMD $13.8 million, we will need some help from USMD to support the projected income stream from the leases. Without that support, we would need to lower the overall value."), and uncertainty as to timing, *id.* ("I am going to have my assistant set-up a time tomorrow for you, Matt Nurkin, and me to discuss the project and the timing."). Although the parties may have expressed positive expectations to signal the sincerity of their desire to reach an agreement, it would be unreasonable for one party to rely on such expressions of expectation without accounting for the other party's statements on how far it was willing to go. Erdman's statement of expectation

occurred during a conversation where it stated its alleged maximum price and the conditions to reaching a $13.8 million price. A reasonable jury could not find that, in concluding this conversation by expressing an expectation to close, Erdman meant that USMD could ignore the terms it had just proposed in the same conversation; it was unforeseeable that USMD would interpret Erdman's expression of expected closure, made immediately after presenting a new offer, as an implicit commitment to agree on USMD's earlier terms.[15] A party cannot be required to make offers that meet all of the opposing party's demands, merely from the party's expression of confidence that an agreement will be reached.

Given the court's conclusion that a reasonable jury could not find justifiable reliance, the court need not address whether USMD incurred expenses in reliance. The court grants summary judgment dismissing USMD's counterclaim for promissory estoppel.

C

USMD asserts a claim for negligent misrepresentation regarding the purchase of MOB I and the development of MOB II.[16] Regarding

---

[15]Erdman continued to make proposals on MOB I, but USMD did not accept them, explaining in an email from Weiss to Happ that it would consider "all its options." Ds. 10-6-10 App. 202.

[16]USMD also alleges that Erdman misrepresented its "expertise . . . in matters and deals of this type." 2d Am. Answer ¶ 83. But this argument was not pursued further in USMD's summary judgment response, despite Erdman's direct challenge on this point in its summary judgment motion and brief. Given the absence of evidence showing Erdman's inexperience, the court dismisses this basis for USMD's negligent misrepresentation counterclaim.

MOB I, USMD alleges that Erdman made two negligent misrepresentations:[17] first, that it proposed in the April Letter to pay $14.1 million for MOB I at a time when it had no reasonable basis to believe that due diligence would support that price; and second, by representing that "We are going to get this deal done," in an October 11, 2007 email exchange, at a point in time when due diligence had already revealed a number of problems that would affect MOB I's value. Regarding MOB II, USMD alleges that Erdman falsely and negligently represented in the September 14 Letter that it "agree[d] to go 'at risk' for all of the fees for the scope of the work described above [i.e., initiating programming, schematic design, and development, engaging prospective tenants, developing the ground lease and space leases, and reviewing information as needed to establish a purchase price for MOB I][.]" Ds. 10-6-10 Br. 8 (paraphrasing Ds. 9-15-10 App. 113).[18]

---

[17]USMD also briefly argues that the Development Plan Term Sheet's superseding clause is a negligent misrepresentation of Erdman's position because Erdman now alleges that Weiss's earlier statement to make Erdman whole has legal effect. As Erdman explains, however, the estoppel argument relying on the statements to make Erdman whole were presented in the alternative in the event the Development Plan Term Sheet is found unenforceable; there is no evidence to indicate that Erdman did not intend to be bound by the superseding clause of the Development Plan Term Sheet at the time of the contract. This argument is therefore misplaced.

[18]Erdman attempts to raise a statute of limitations defense in its reply brief. "[T]he court will not consider an argument raised for the first time in a reply brief." *Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) (citing *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.)),

> Under Texas law, the elements of a claim
> for negligent misrepresentation are: (1) the
> representation is made by a defendant in the
> course of his business, or in a transaction in
> which he has a pecuniary interest; (2) the
> defendant supplies "false information" for the
> guidance of others in their business; (3) the
> defendant did not exercise reasonable care or
> competence in obtaining or communicating the
> information; and (4) the plaintiff suffers
> pecuniary loss by justifiably relying on the
> representation.

*5636 Alpha Rd. Joint Venture v. NCNB Tex. Nat'l Bank*, 879 F. Supp.

655, 664 (N.D. Tex. 1995) (Fitzwater, J.) (citing *Fed. Land Bank*

*Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).  Although the

Supreme Court of Texas has yet to limn the types of statements that

are actionable under this tort, many Texas courts of appeals have

held that "the sort of 'false information' contemplated in a

negligent misrepresentation case must be a misstatement of *existing*

*fact*, not a promise of future conduct." *Allied Vista*, 987 S.W.2d

at 141 (emphasis in original) (citing *Airborne Freight Corp., Inc.*

*v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex. App. 1992,

writ denied); *accord Scherer v. Angell*, 253 S.W.3d 777, 781 (Tex.

App. 2007, no pet.) (citing *Miller v. Raytheon Aircraft Co.*, 229

S.W.3d 358, 379 (Tex. App. 2007, no pet.)) (reversing and rendering

take nothing judgment in negligent misrepresentation case where

construction company offered to do some work for free in order to

get hired for building project, because representation related to

---

*aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

"an act to be performed in the future").[19]

Assuming the consensus in the courts of appeals reflects the rule that the Supreme Court of Texas will ultimately adopt, this court would be required to grant summary judgment dismissing USMD's negligent misrepresentation counterclaim. An offer to "go 'at risk'" for MOB II, if accepted, would constitute a promise regarding future conduct. A promise to pay $14.1 million for MOB I would also be a promise of future conduct. USMD does not argue otherwise. USMD offers a contrary argument only regarding the statement "We are going to get this deal done," alleging that this was a factual representation that the deal——specifically, a "combined approach" deal conforming to the terms from the April Letter, "without altering the purchase price or making a counter offer"——was "presently on track." Ds. 10-6-10 Br. 16-17. USMD's

---

[19]Perhaps the closest the Supreme Court of Texas has come to acknowledging a distinction between factual and nonfactual representations is in *McCamish v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999). In *McCamish* the court addressed in *dicta* that an attorney's statements communicating her client's negotiating position would not qualify as negligent misrepresentation because such communications were not "statements of material fact." *Id.* at 794. Elsewhere in the opinion, however, the court noted that other jurisdictions have imposed liability for negligent misrepresentation based on the issuance of opinion letters or the preparation of evaluations. *Id.* at 793. Overall, the reasoning in *McCamish* does not appear to provide much help in predicting the Texas Supreme Court's position on nonfactual representations because the apparent purpose for the court's analysis was to address the issue of *who* can be sued for negligent misrepresentation (i.e., whether attorneys can be sued), rather than *for what* (i.e., the type of statements falling within the scope of negligent misrepresentation liability).

attempt to recast this forward-looking statement as a restatement of existing fact lacks force.[20]  One may express resolve to persist in negotiations and to "get [a] deal done" in the future even if, for example, the present state of negotiations appears somewhat uncertain.  Such an expression is not a misstatement of existing fact.  The case is clearly distinguishable from the circumstances in *Sloane*, 825 S.W.2d at 441, where a bank loan officer informed the borrowers that the bank "had approved the loan," when it had not, because it was a false representation of a present fact (i.e., whether the bank had already approved the loan).

Nevertheless, even if this court were to assume that the Supreme Court of Texas would not require a "misstatement of existing fact" as a prerequisite for a negligent misrepresentation claim, this court will still grant summary judgment because a reasonable jury could not find in USMD's favor on the elements of false representation and justifiable reliance.

Turning first to the April Letter, a reasonable jury could only find that such a tentative proposal of price, in an expressly non-binding letter of intent, was merely a representation of willingness to work toward that price for purposes of "facilitat[ing] further discussion and negotiation," Ps. 9-15-10 App. 55, as stated in the letter of intent, and not a

---

[20]Furthermore, in making its promissory estoppel argument, USMD admitted that it interpreted this statement as a promise of future conduct and relied upon it as such.

representation of Erdman's commitment to that price. USMD alleges that Erdman falsely represented this willingness when it allegedly should have known that due diligence would not support the $14.1 million price, but this argument fails due to the absence of evidence that would enable a reasonable jury to find in USMD's favor. The facts on which USMD relies have no bearing on whether USMD had any intention of paying $14.1 million. First, USMD alleges that "Erdman believed that MOB I would only support a purchase price around $10 million," and it relies on a portion of Happ's deposition testimony where Happ admitted that USMD did not like the value Erdman proposed for MOB I and recounted that USMD told Erdman it would probably lose the design and construction work for MOB II if other developers purchased MOB I. A reasonable jury could not find from Happ's testimony that Erdman would only support a purchase price of around $10 million; the testimony would only permit the conclusion that USMD did not like Erdman's initial offer and warned Erdman of the possibility of losing the MOB II work. Second, USMD relies on Becker's deposition testimony that, "anytime you believe that somebody has an expectation of, you know, something being worth 15 million or more and you're going to offer, you know, something more in line with 10 million, we would anticipate that they're going to react negatively." Ds. 10-6-10 App. 27. This provides no support for USMD's inference that "[n]o amount of due diligence would have compelled Erdman to pay more

[than $10 million] for MOB I."  Ds. 10-6-10 Br. 14.  It would be unreasonable for the jury to infer that a party's first offer would be its last; Becker's testimony only permits the finding that Erdman was assuming an early negotiating posture, not taking a final position.  The fact that a party believed a $10 million price structured one way was reasonable before due diligence does not mean it was unwilling to be persuaded to consider a $14.1 million price structured another way if supported with favorable due diligence outcomes.  And USMD has presented no summary judgment evidence that would permit a reasonable finding that Erdman ever offered USMD a final, nonnegotiable price.[21]  In fact, the summary judgment evidence indicates that Erdman proposed several options exceeding $10 million over the course of the negotiations, *see, e.g.*, Ps. 10-15-10 App. 49 (proposing $12.0 million option and $13.5 million option with "combined approach"), 67 (proposing $13.5 million), 95 (setting tentative goal at $13.8 million and discussing ways to achieve this).

In conclusion, a reasonable jury could not find that the $14.1

---

[21]A reasonable jury could only find that the closest Erdman came to issuing a maximum price ultimatum was in a January 2, 2008 email, sent after a significant amount of due diligence had been completed, that stated: "We believe . . . our existing offer [for $13.8 million and various new conditions] brings the most dollars to USMD and is the best financial option."  Ps. 10-15-10 App. 63. But a reasonable jury could not find from the fact that Erdman made a proposal slightly under the target price after due diligence that the $14.1 million price discussed in the April Letter, which predated the due diligence, was unrealistic.

million figure quoted for "discussion" purposes in the April Letter was false when made. Even if due diligence conducted over the summer of 2007 made agreement on the April figure more doubtful, and even if Erdman failed to communicate the results of the due diligence in a timely manner, as USMD alleges, these facts have no bearing on whether the April Letter's figure, which was suggested prior to due diligence, was a dishonest representation of Erdman's intentions to aim for the $14.1 million figure in negotiating a subsequent binding agreement.

The court turns next to USMD's argument regarding Erdman's alleged promise to "get this deal done" on October 11, 2007, after much of the due diligence had already been completed over the summer of 2007. USMD argues that Happ's statement, "We are going to get this deal done," was a negligent and false representation that the deal——meaning, according to USMD, a deal specifically following the April Letter's $14 million price——would "'get done' without altering the purchase price or making a counter offer," Ds. 10-6-10 Br. 16, given that, by October 11, 2007, Erdman was already aware of a number of problems discovered through due diligence, such as changing market conditions. A reasonable jury could not find in favor of USMD in this respect. It could only find that it was unreasonable and unjustifiable for USMD to interpret Happ's remark in this way and to rely on it as an assurance that the parties would reach a deal that matched the April Letter. Nothing

in the email conversation suggests that Happ's mention of "this deal" referred to a "specific deal" according to the tentative terms proposed in the April Letter. Given that the parties and the third party had continued to negotiate on revisions to the April Letter's terms, well into late September 2007 and that the October 11, 2007 conversation itself contemplated the possibility that there would be obstacles to agreement and comments solicited from the parties on various aspects of the deal, it would have been objectively unreasonable for USMD to interpret Happ's statements as a promise to make the deal happen according to the terms as they stood on April 20, 2007, completely foreclosing the parties from the possibility of making counteroffers during the course of negotiations. When reasonably interpreted, a jury could not find that the statement was a false representation. As already discussed concerning promissory estoppel, Happ's statement in the October email can only be reasonably interpreted as an expression of his resolve and hope for reaching some sort of agreement on the MOB I acquisition deal, not a promise to reach a deal according to the terms of the April Letter.

Last, the court evaluates whether a reasonable jury could find that Erdman's proposal to go "at risk" was a negligent misrepresentation, and concludes that it could not. The summary judgment record does not support the finding that the proposal to go "at risk" was a false representation or justifiably relied upon.

The terms of the September 14 Letter were never accepted; indeed, if they were, then USMD would be held to the statement, "In recognition of [Erdman's] 'at risk' position in this agreement, [USMD] agree[s] not to solicit or engage other design, construction or real estate development firms on this project," Ds. 10-15-10 App. 113, an obligation that USMD clearly disavows.  The "[i]n recognition of" wording of the letter and the present tense used (i.e., "Erdman agrees," "USMD . . . agree[s]") indicates that Erdman intended the "at risk" obligation to run concurrently with USMD's exclusivity obligation.  A reasonable jury could only find that the "Erdman agrees to go 'at risk'" statement was not a unilateral gift on Erdman's part, but a term of service proposed as consideration for USMD's commitment to exclusivity.  Furthermore, the letter concludes with a form containing the following typed words: "Accepted: / USMD at Arlington, GP, LLC" (words typed by Erdman), a blank signature line for "Greg Weiss / President," and a blank line for "Date."  The lines in the form remained blank.  A reasonable jury could only find that both parties intended and interpreted this letter as a proposal that required acceptance to become effective.  The jury could not find that Erdman represented falsely its intent to go at risk for the services outlined if USMD accepted the letter.  A reasonable jury could only find that USMD did not justifiably rely on Erdman to be bound to an offer that was never accepted, especially when USMD acknowledges no obligation to

keep its end of the bargain.

*     *     *

Accordingly, for the reasons explained, USMD's September 15, 2010 motion for summary judgment is granted in part and denied in part. Erdman's September 15, 2010 motion for summary judgment is granted. Erdman's October 29, 2010 motion to correct its October 20, 2010 reply is denied.

**SO ORDERED.**

April 11, 2011.

<br>

_____
SIDNEY A. FITZWATER
CHIEF JUDGE